**UNITED STATES FEDERAL COURT
SOUTHERN DISTRICT OF NEW YORK**



|  |  |
|---|---|
| STEPHEN POSKO, Derivatively on Behalf of MILLENNIAL MEDIA, INC., ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: |

STEPHEN POSKO, Derivatively on Behalf of )
MILLENNIAL MEDIA, INC.,                   )
                                          )     Case No.:
                                          )
                                          )
                         Plaintiff,       )     VERIFIED SHAREHOLDER
                                          )     DERIVATIVE COMPLAINT
            v.                            )
                                          )
PAUL J. PALMIERI, MICHAEL B. AVON,        )
MICHAEL BARRETT, PATRICK J.               )
KERINS, THOMAS R. EVANS, ROBERT P.        )
GOODMAN, WENDA H. MILLARD, ROSS           )
LEVINSOHN, JAMES A. THOLEN, ALAN          )
MACINTOSH, JOHN D. MARKLEY                )
                                          )
                         Defendants,      )
                                          )
            – and –                       )
                                          )     DEMAND FOR JURY TRIAL
MILLENNIAL MEDIA, INC., a Delaware        )
corporation,                              )
                                          )
                    Nominal Defendant.    )
_____)

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action by Stephen Posko ("Plaintiff") on behalf of

nominal defendant Millennial Media, Inc. ("Millennial Media" or the "Company") against

certain of its current and former officers and directors for breaches of fiduciary duty, waste of

corporate assets, unjust enrichment, and violations of the Securities Exchange Act of 1934 (the

"Exchange Act").  These wrongs resulted in damage to Millennial Media's reputation, goodwill,

and standing in the business community.  Moreover, the Individual Defendants (as defined

herein) have exposed the Company to tens of millions of dollars or more in potential liability for

violations of federal law.

2.     Millennial Media primarily generates revenue by charging advertisers to deliver

advertisements to mobile devices.  Since going public in 2012, the Company has claimed to be

"the leading independent mobile advertising platform company delivering market-leading products and services to advertisers and developers."  The Company intended to utilize a proprietary technology and data platform, referred to as "MYDAS," to "reach and connect with their target audiences across screens—from smartphones, tablets and other mobile devices to PCs."  Millennial Media aimed to provide application "developers the ability to maximize their advertising revenue and acquire new users."[1]

3.     Investors would later learn, however, that Millennial Media's technological products and services, which were crucial to the Company's business model, were not fully functional.  Instead, these products and services were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and ultimately failure.  Likewise, investors learned in May 2014 that the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media.

4.     The Individual Defendants, who each served as either an executive of the Company or a member of its Board during the relevant period, caused the Company to engage in several corporate acquisitions that supposedly offered business synergies. However, it is now clear the transactions were untaken to fill gaping holes in the Company's capabilities.  The Individual Defendants also made statements and/or allowed Millennial Media to make statements regarding these corporate acquisitions that misrepresented the progress of these integrations, when, in fact, the Company faced insurmountable challenges.

---

[1]     *See* Form 10-K filed with the United States Securities and Exchange Commission on March 3, 2014 for the period ending December 31, 2013.

5.      When the truth regarding the multitude of the undisclosed problems facing the Company became apparent to its investors, Millennial Media's market capitalization dropped dramatically.  The Company is now the subject of two securities class action lawsuits filed in the United States District Court for the Southern District of New York on behalf of investors who purchased Millennial Media's shares since its initial public offering ("IPO").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over each defendant named herein.

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Millennial Media is a corporation that conducts business and maintains operations in New York.  The Individual Defendants have sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, including dissemination of certain materially false and misleading information to shareholders in connection with transactions described herein.

**Plaintiff**

10.     Plaintiff Stephen Posko was a shareholder of Millennial Media at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current

Millennial Media shareholder.

**Nominal Defendant**

11.     Nominal Defendant Millennial Media is a Delaware corporation with principal executive offices located at 2400 Boston Street, Suite 201, Baltimore, MD 21224.  Millennial Media common stock trades on the New York Stock Exchange under the ticker symbol "MM." As of January 31, 2014, Millennial Media had 106,585,564 shares of common stock outstanding.

**Individual Defendants**

12.     Defendant Paul J. Palmieri ("Palmieri") was, at all relevant times prior to January 25, 2014, President and Chief Executive Officer ("CEO") of the Company, and a member of the Company's Board. During the relevant period, CEO Palmieri certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

13.     Defendant Michael B. Avon ("Avon") was the Executive Vice President and CFO of the Company from 2009 until July 1, 2014. During the relevant period, CFO Avon certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

14.     Defendant Michael Barrett ("Barrett") has been, at all relevant times since January 25, 2014, President and CEO of the Company. Defendant Barrett has been a member of the Company's Board since January 2014.

15.     Defendant Patrick J. Kerins ("Kerins") is Chairman of the Company's Board. Defendant Kerins has been a member of the Board since 2009.  Defendant Kerins is Chairman of the Compensation Committee.

- 3 -

16.     Defendant Thomas R. Evans ("Evans") has been a member of the Board since February 19, 2014.  Defendant Evans is a member of the Company's Audit Committee, replacing Defendant John D. Markley when he resigned from the Board.

17.     Defendant Robert P. Goodman ("Goodman") has been a member of the Company's Board since 2009. Defendant Goodman is a member of the Company's Compensation Committee.

18.     Defendant Wenda H. Millard ("Millard") has been a member of the Company's Board since 2009. Defendant Millard is a member of the Company's Nominating and Corporate Governance Committee.

19.     Defendant Ross Levinsohn ("Levinsohn") has been a member of the Company's Board since February 19, 2014.  Defendant Levinsohn is a member of the Company's Audit Committee. Defendant Levinsohn is classified as an "Insider Director" by the Company on its website.

20.     Defendant James A. Tholen has been a member of the Company's Board since 2011.  Defendant Tholen is a Chairman of the Company's Audit Committee, and a member of its Nominating and Corporate Governance Committee.

21.     Defendant Alan MacIntosh was a member of the Company's Board from 2006 until August 2014. During the relevant time, Defendant MacIntosh was a member of the Company's Audit Committee and its Nominating and Corporate Governance Committee.

22.     Defendant John D. Markley was a member of the Company's Board from 2006 until 2014. During the relevant time, Defendant Markley was a member of the Company's Audit Committee.

23.     The Defendants Palmieri, Avon and Barrett, identified in ¶¶12-14, are referred to herein as the "Officer Defendants."

24.     Defendants Evans, Levinsohn, Tholen, MacIntosh, and Markley, identified in ¶¶16, 19-22, are collectively referred to herein as the "Audit Committee Defendants."

25.      Defendants Barrett, Kerins, Evans, Goodman, Millard, Levinsohn, and Tholen, identified in ¶¶14-20, are collectively referred to herein as the "Current Director Defendants."

26.     Defendants Palmieri, MacIntosh and Markley, identified in ¶¶12, 21-22, are referred to herein as the "Former Director Defendants."

27.     Defendants Palmieri, Avon, Barrett, Kerins, Evans, Goodman, Millard, Levinsohn, Tholen, MacIntosh and Markley, identified in ¶¶12-22, are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers, directors, and/or fiduciaries of Millennial Media and because of their ability to control the business and corporate affairs of Millennial Media, the Individual Defendants owed and owe Millennial Media and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Millennial Media in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Millennial Media and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of Millennial Media were required to exercise reasonable and prudent supervision over the management, policies,

practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Millennial Media were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

(c)     ensure that no inaccurate information about the Company was released to the public that would tend to artificially inflate the Company's stock and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how Millennial Media conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Millennial Media, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents

of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Millennial Media, each of the Individual Defendants had access to adverse, non-public information about the financial condition and operations of Millennial Media.

31.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Millennial Media, and was at all times acting within the course and scope of such agency.

32.     Each officer and director of the Company owes to Millennial Media and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Millennial Media, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Millennial Media's Board.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing, or by themselves causing, the Company to falsely represent the capabilities of Millennial Media's technological products and services, which were crucial to the Company's business model.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.   In addition, as a result of the defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of securities laws.   As a result, Millennial Media has expended, and will continue to expend, significant sums of money.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Millennial Media, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**Additional Duties Arising from Millennial Media's Code of Business Conduct and Ethics**

36.     Millennial Media's Code of Business Conduct and Ethics (the "Code") imposes substantial duties upon all of Millennial Media's officers, directors, and employees.   The Code states, in pertinent part:

1.     HONEST AND ETHICAL CONDUCT

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

2.     LEGAL COMPLIANCE

Obeying the law is the foundation of the Code of Conduct. Our success depends upon our personnel operating within legal guidelines and cooperating with local, national and international authorities. … Disregard of the law will not be tolerated. …

**Additional Duties Arising from Millennial Media's Corporate Governance Guidelines**

37.     Millennial Media's Corporate Governance Guidelines (the "Guidelines") outline the responsibility and function of the Board.  The Guidelines state, in pertinent part:

> The Board is selected by the stockholders to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and to exercise his or her business judgment in the best interests of the Company and its stockholders. … More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing the Company and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of the Company. … Directors must act with integrity and are expected to demonstrate a commitment to the company, its values and its business and to long-term stockholder value.

**Additional Duties of the Audit Committee Defendants**

38.     In addition to these duties, the Audit Committee Defendants owed specific duties to Millennial Media to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.  The Audit Committee's Charter provides in relevant part, that Audit Committee members shall:

> act on behalf of the [Board] in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements … and the performance of the Company's internal audit function. The Committee shall also provide oversight assistance in connection with the Company's legal and regulatory compliance.

39.     Despite these additional duties, Defendants Evans, Tholen, Levinsohn, MacIntosh and Markley wholly abdicated their responsibilities to the Company and its shareholders by

allowing the Company to issue improper statements, and failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing improper statements.

## BACKGROUND

40.     Millennial Media is a digital advertising company that provides advertising services focused on the mobile computing segment, such as smartphones that run Apple, Inc.'s iOS operating system, Google, Inc.'s Android operating system, or other operating systems.

41.     The Company provides its services to developers and advertisers. Key to Millennial Media's success in this industry is that its technology provides an easy and effective way for developers of applications for mobile devices to integrate the Company's advertising mechanism into their software, and track and generate accurate reports of results for advertisers' campaigns.

42.     Millennial Media's technology was portrayed as offering two critical selling points: (1) its ability to provide an easy method for developers of applications for mobile devices to integrate the Company's advertising mechanism into their software; and (2) its ability to track and generate accurate reports of results for advertisers' campaigns.

43.     Although Millennial Media reports its operations in a single, undifferentiated business segment, the Company's operations are divided among two highly distinct types of advertisements: (1) "brand advertisements" intended only to be displayed before an audience; and (2) "performance advertisements" intended to spur audience members to engage in some action, such as clicking on the advertisement or downloading a file.

44.     Brand advertisements are generally sold on the basis of a cost per 1,000 impressions ("CPM"), while performance advertisements are generally sold on the basis of a cost per click ("CPC") or a cost per action ("CPA").

45.     Throughout the relevant period, the Company touted its proprietary technology and data platform, referred to as "MYDAS," as a solution for both application developers and advertisers insofar as MYDAS and its component services allowed for both: (1) the easy and effective integration of Millennial Media advertising into mobile applications by developers; and (2) the flexible targeting and accurate reporting of advertising campaigns for advertisers. Millennial Media also claimed that the features and performance of its MYDAS platform were drawing customers and that its strategic acquisitions were enhancing the Company's existing capabilities.

**Millennial Media Goes Public**

46.     On March 28, 2012, Millennial Media's IPO Registration Statement was declared effective and the Company finalized its completed prospectus in connection with the IPO (the "IPO Prospectus" and together with the IPO Registration Statement, the "IPO Documents"). As set forth in the IPO Prospectus, Millennial Media registered 10.2 million shares of common stock plus an underwriters' over-allotment option for an additional 1,530,000 shares to be offered to the public at $13.00 per share.

47.     Trading in Millennial Media shares commenced on the NYSE on March 29, 2012.

48.     The IPO Documents included descriptions of the Company and its competitive strengths. For example, the IPO Prospectus stated:

> Our [proprietary technology and data platform, known as MYDAS] is specifically architected to ***deliver mobile advertising at scale, rather than applying traditional online advertising technology or focusing on particular mobile operating systems.*** . .

. *Our platform is capable of accounting for, and efficiently analyzing, variables such as wireless connection strength, device operating system and audience profile in real-time* in order to decide which ad to send in response to a specific ad request from an app.

\* \* \*

*We offer developers sophisticated reporting and analytics through an integrated dashboard on our mmDev portal, which includes comprehensive ad revenue generation reports for their apps across all major mobile operating systems.* These reports help developers gain insight into user interaction and behavior and the performance of their apps. We share this performance data with developers to help them improve their apps and 'heir deployment of our [software developers' kits, or "SDK"s] in order to maximize their ad revenue. In addition, through the more than 1.5 billion ad requests that we typically receive each day, we are able to gain important insights about users that we are able to share with developers on an aggregated basis.

\* \* \*

We help developers and advertisers remove complexity from mobile advertising. By working with us, developers gain access to our tools and services that allow their apps to display banner ads, interactive rich media ads and video ads from our platform. In return, developers supply us with space on their apps to deliver ads for our advertiser clients and also provide us with access to anonymous data associated with their apps and users. *We analyze this data to build sophisticated user profiles and audience groups that, in combination with the real-time decisioning, optimization and targeting capabilities of our technology platform, enable us to deliver highly targeted advertising campaigns for our advertiser clients.*

\* \* \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, *MYDAS delivers the request to a realtime, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.* We call this process optimization and decisioning. . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

- 12 -

(All emphases are added unless otherwise noted.)

49.     On or about April 4, 2012, Millennial Media completed its IPO.

50.     Analysts noted the importance of the competitive advantage Millennial Media claimed due to its technology.  Capstone Investments initiated its coverage of the Company on April 16, 2012 with "buy" rating, setting a target price of $28 due to "Proprietary technology [that] helps attract publishers and increases asset value. Millennial campaigns can be incorporated into standard ad serving technologies[.]"

**Millennial Media's Early Financial Results**

51.     On May 14, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2012. The Company reported total revenue of $32.9 million, gross margin of 39.5 percent, and 300 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the second quarter of between $37 million and $38 million; and (2) the full year 2012 of between $173 million and $176 million.

52.     In connection with these results, CEO Palmieri stated:

> As a market leader, *we believe Millennial Media is well-positioned to drive the business model of the worldwide app economy.*

53.     On May 15, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

54.     On August 8, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the second quarter of 2012. The Company reported total revenue of $39.4 million, gross margin of 39.7 percent, and more than 350 million

monthly unique users worldwide. The Company also offered revenue guidance for: (1) the third

quarter of between $43.5 million and $45 million; and (2) the full year 2012 of between $176

million and $179 million.

55.     In connection with these results, CEO Palmieri stated:

> We delivered strong revenue growth of 76% year over year, along
> with expanded gross margin performance and improved operating
> leverage in the second quarter. We now have over 35,000 enabled
> apps on our mobile advertising platform, which *we believe
> underscores the compelling value proposition we bring to our
> developer partners.*

56.     At or about the same time, Millennial Media hosted a conference call for investors

and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> Our performance in the period reflects the positive momentum
> we've established in the mobile advertising market. As the
> [industry's] leading independent provider, *we are positioned for
> continued growth and market share gains on the strength of our
> scale, our differentiated technology platform, our advanced
> targeting capabilities, based on this large and growing data asset,
> and our deep integrations and relationships with app developers
> and advertisers alike.* At Millennial Media we are singularly
> focused on delivering superior results in the market and to our
> clients.
>
> Mobile is all that we do and we have differentiated scale in that
> market. It is because of the years of this singular focus that we are
> succeeding in mobile monetization where others are not. *We have
> built the technologies and products that solve for the complexities
> and challenges inherent in mobile,* while also taking advantage of
> an entirely new opportunity presented by mobile.
>
> * * *
>
> With our proprietary MYDAS technology and our large and
> growing data assets, we are able to build real world audiences from
> mobile specific data such as location data or point of sale data. We
> use that data to better target [ads] to the right people at the right
> time, so that they are more likely to engage with that ad. And once
> a campaign has run, *we are able to provide increasingly more
> comprehensive analytics and insights,* enabling them to develop
> even more effective campaigns in the future on our platform.

57.     On August 9, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

**Millennial Media's Secondary Offering**

58.     On October 15, 2012, Millennial Media filed a Form S-l registration statement with the SEC in connection with the Company's contemplated Secondary Offering. The Company filed an amended version of this registration statement on October 18, 2012 (as amended, the "Secondary Offering Registration Statement").

59.     On October 23, 2012, the Secondary Offering Registration Statement was declared effective and the Company finalized the Secondary Offering Prospectus.

60.     As set forth in the Secondary Offering Prospectus, Millennial Media registered 10 million shares of common stock plus an underwriters' over-allotment option of an additional 1.5 million shares to be offered to the public at $14.15 per share. The Secondary Offering Documents set forth descriptions of the Company and its competitive strengths including those described above.

61.     The Secondary Offering Documents included descriptions of the Company and its competitive strengths. For example, the Secondary Offering Prospectus stated:

> We enable advertisers to gain insights into the performance of their ad campaigns and to manage their campaigns with a view to maximizing return on their advertising investment**. *Our solutions are designed to address the needs of large brand advertisers and advertising agencies as well as smaller, performance-based advertisers***. Large brand and performance advertisers typically buy ads on our platform through our sales teams. Smaller advertisers typically buy ads either through our inside sales team or through our mMedia self-service advertising portal.

* * *

As a result of the amount and nature of the data we collect through our platform, ***our reporting to advertisers goes beyond traditional post-campaign analysis to provide actionable insights for current ad campaigns and future marketing strategies. We offer real-time reporting and analytics to help advertisers understand why some campaigns perform better than others***.

***Our self-service interface also enables advertisers to plan and alter live campaign parameters, such as audience targeting and pricing.*** We also give our larger advertisers the option to work directly with our advertising account specialists, who help our clients manage their ad campaigns.

\* \* \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, ***MYDAS delivers the request to a real-time, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.*** We call this process optimization and decisioning. . .. When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

62.    On or about October 30, 2012, Millennial Media completed the Secondary Offering including the full exercise of the underwriters' over-allotment option.

**Millennial Media's Performance Following Secondary Offering**

63.    On November 5, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2012. The Company reported revenue of $47.4 million, gross margin of 40.9 percent, and more than 380 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the fourth quarter of between $61.5 million and $63 million; and (2) the full year 2012 of between $181 million and $182.5 million.

64.     At or about the same time, Millennial Media hosted a conference call for investors

and analysts to discuss these results. As part of his prepared remarks CEO Palmieri stated:

> Our strong results for the period, along with our increased full year
> outlook, speak to the traction we've established as the go to
> provider of mobile monetization solutions. ***There's been a lot of
> discussion in the media lately about a mobile monetization
> problem. From our perspective and as reflected in these financial
> results, there is no mobile monetization problem, just the growing
> opportunity for Millennial Media to capitalize on***.
>
> * * *
>
> ***Performance advertisers, such as app developers who want to
> drive downloads of their apps, use our platform*** to reach and
> target customers who will generate positive lifetime value for
> them. Lifetime value, or LTV, is a specific financial metric used by
> performance advertisers to determine the difference between the
> cost to drive a download and the revenue generated from that
> download over the lifetime of that app's usage by a single
> consumer. ***Because we are able to deliver this long-term value-or
> lifetime value, by quality downloads in addition to the quantity of
> downloads, we have become an invaluable source for delivering
> differentiated value for this segment of our advertiser base.***

65.     On November 6, 2012, prior to the opening of the markets, Millennial Media filed

its quarterly report on Form 10-Q with the SEC, which included substantially similar financial

results as those set forth in the Company's earlier press release.

66.     On November 19, 2012, Janney Capital Markets issued a report concluding:

> Millennial operates in one of the fastest growing segments of
> digital advertising market, mobile advertising, has a strong market
> positioning owing to an early mover advantage, experienced
> management, valuable technology and data assets, and an attractive
> value proposition to advertisers.

67.     On February 19, 2013, after the close of the markets, the Company issued a press

release announcing its results of operations for the fourth quarter and full year of 2012. The

Company reported revenue in the fourth quarter of $58 million-sharply below analysts'

expectations of $62.9 million-as well as gross margin of 41.2 percent, and more than 400 million

monthly unique users worldwide. The Company's full-year results included revenue of $177.7 million and gross margin of 40.5 percent. The Company also offered disappointing revenue guidance for: (l) the first quarter of 2013 of between $48 million and $50 million; and (2) the full year 2013 of between $270 million and $280 million.

68.     In connection with these results, CEO Palmieri stated:

> ***Our success in 2012 speaks to the effectiveness of our platform model in delivering highly targeted and compelling mobile advertising solutions.*** We delivered 68% revenue growth with record profitability in the fourth quarter. Mobile advertising is still in its early stages of development, and we believe its tremendous growth potential will transform digital advertising. As a native mobile company, we are excited about our leadership position in the market and our business prospects in 2013.

69.     In connection with the earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Palmieri stated in part:

> [A]s we conduct this call today, there is no question Millennial Media is the leading independent platform in the Mobile Advertising business and powering the app economy. ***There now also can be no doubt that our model is proven and strong. Our platform is having success and our investments in technology and data are delivering the solutions that show marketers the power and value of mobile.***
>
> * * *
>
> [W]e have some choices that we made in Q4 consistent with our long-held strategy on whether to chase some business in some performance segments or to continue to focus on large budget brand campaigns and premium performance campaigns that have always been our bread-and-butter business. ***It wasn't until very late in the quarter that we saw that our choice not to participate in some of these lower end performance segments, coupled with a few large brand deals that didn't materialize would moderate our revenue growth metric for the quarter.***

70.     CEO Palmieri also announced that the Company had reached an agreement to acquire Metaresolver, a mobile media buying and targeting platform, stating in part:

> This small but strategic all cash acquisition will help us deliver additional programmatic buying solutions to advertisers and will enhance our ability to capture and analyze highly relevant data to produce better results for advertisers and developers.

71.     On February 20, 2013, prior to the opening of the markets, Millennial Media filed its Annual Report for 2012 on Form 10-K with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

72.     On April 5, 2013, Millennial Media issued a press release and filed a Current Report on Form 8-K with the SEC announcing the completion of the acquisition of Metaresolver for $14.0 million in cash.

73.     On May 8, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2013. The Company reported revenue of $49.4 million, gross margin of 41.6 percent, and more than 420 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the second quarter of between $58 million and $60 million; and (2) the full year 2013 of between $270 million and $280 million.

74.     In connection with these results, CEO Palmieri stated:

> We've gotten off to a solid start this year, with good growth and continued innovation. Usage of our platform continued to grow, with strong margins. We delivered a major new release of our SDKs, we closed on our acquisition in the programmatic mobile space, and we delivered financial performance consistent with or ahead of our prior guidance.

75.     On May 9, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

**Millennial Media Acquires Jumptap**

76.     On August 13, 2013, Millennial Media issued a press release announcing that the Company had reached an agreement to acquire Jumptap in a transaction that would be funded nearly entirely by 24.6 million shares of Millennial Media stock.  Concurrently, the Company issued a press release announcing its results of operations for the second quarter of 2013. The Company reported revenue of $57 million, gross margin of 42.4 percent, and more than 450 million monthly unique users worldwide. The Company did not include guidance for the coming quarter or an update to its guidance for the full year in the press release in a manner consistent with prior practice, but rather directed investors to a presentation on its website and stated that guidance would be discussed on its earnings call that day.  Defendant Palmieri stressed during Millennial Media's earnings conference call that the Company has been ***"somewhat conservative along the way in terms of our spending"*** and that it "***is near or at the top of growth rates for technology, media and telecom companies across the board***."

77.     In connection with these results, CEO Palmieri stated:

> We had a solid growth quarter in 2Q with good showing in international and brand advertising. We had strong margins during the quarter with increased platform usage by some of the largest brand advertisers in the world. We are also very pleased to announce our acquisition of Jumptap and look forward to bringing our integrated capabilities to the global mobile advertising market.

78.     On August 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

79.    The acquisition of Jumptap was viewed by shareholders as a positive development for long-term growth.  As noted by Oppenheimer in a report dated September 15, 2013, the Jumptap acquisition allowed Millennial Media to have a "full suite of advertising products for 2014."  Oppenheimer notes that by taking Jumptap's ad server in-house, Millennial Media should enjoy a gross margin increase of 150 bps while gaining access to Jumptap's "rich third-party data ... which should increase advertiser demand."  A previous Oppenheimer report also noted that the acquisition would "remove[] a competitive overhang" for the Company.

80.    On November 6, 2013, Millennial Media issued a press release announcing the completion of its acquisition of Jumptap.

81.    On November 13, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2013. The Company reported pro forma combined revenue of $86.3 million, pro forma combined gross margin of 38.6 percent, and more than 500 million monthly unique users worldwide on a non-combined basis. The Company also offered total pro forma combined revenue guidance for the fourth quarter of between $95 million and $100 million.

82.    In connection with these results, CEO Palmieri stated:

> We've made substantial progress building and strengthening our full-stack mobile advertising platform this year. Through our acquisition of Jumptap, the global launch of MMX, our mobile ad exchange, and the introduction of our Omni Measurement suite, we are uniquely positioned to be the partner of choice to the world's largest advertisers and agencies. In the third quarter we generated $86 million in combined pro forma revenues driven by strong brand and international results and growth in programmatic performance revenues via the newly acquired Jumptap capabilities. ***Our integration is going well and we are very enthusiastic about bringing our combined capabilities to the global mobile advertising market.***

83.     Later that day, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> 2013 has been a year where this industry has been in transition. In some cases, like the international or video opportunity, we were the first in line for new opportunities and, in many cases, the authors of change, flexing our competitive advantages in data and global scale. ***In other cases, like addressing the growing importance of performance advertising and RTB buying capability, we saw a need to make big moves, to fill in real gaps, that represent key parts of the future of the platform.***
>
> * * *
>
> The market for performance business is moving rapidly towards programmatic buying and Jumptap's key real-time bidding capabilities are complementary to the platform.
>
> * * *
>
> As we move through the integration phase of this acquisition, we're even more excited about this combination than we were when we first announced the deal. ***Our companies fit very well together, with complementary strength in both our capabilities and our cultures. Our teams are working very well together. The two companies are culturally similar and share a history of competing in the same space***. We're rapidly bringing the companies together as one, and we're very impressed with Jumptap's team.

84.     On November 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

85.     On January 27, 2014, the Company issued a press release announcing preliminary results for the fourth quarter of 2013. In connection with these preliminary results, CFO Avon stated:

> We are very pleased with Millennial Media's strong fourth quarter performance. With the addition of Jumptap's capabilities we bring to market an expanded suite of offerings, delivering solid results for our brand and performance clients. ***The integration plan is ahead of schedule***, enabling us to complement our historical

> *strength among brand advertisers with market leading solutions for our performance clients through our demand-side programmatic buying capabilities and our premium exchange (MMX).* Millennial Media enters 2014 with a much stronger and more comprehensive suite of capabilities than at this time last year positioning us well to capitalize on these assets in the year ahead.

86.     The Company did not offer guidance for the coming quarter or full year in connection with its earnings pre-announcement.

87.     On January 30, 2014, Millennial Media filed a Form 8-K with the SEC setting forth its January 27, 2014 press release. Additionally, the Company disclosed that on January 25, 2014, CEO Palmieri had resigned from his roles as President and CEO of the Company and as a member of the Company's Board. Further, the Company revealed that the Board had appointed Michael Barrett as the Company's President and CEO, and had appointed CEO Barrett to the Board, effective January 25, 2014.

88.     On February 19, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2013. The Company reported pro forma combined revenue in the fourth quarter of $109.5 million and pro forma combined gross margin of 38.2 percent. The Company's full-year results included pro forma combined revenue of $341.8 million and pro forma combined gross margin 39.4 percent.

89.     Millennial Media further offered disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million-far below analysts' expectations of $83 million. The Company also gave weak guidance for EBITDA of between - $5 million and -$6 million, sharply diverging from analysts' expectations of +$8.8 million.

90.     In connection with these results, CFO Avon stated:

> Our fourth quarter success is a testament to the strategic decisions we made in 2013. *From the acquisition of Jumptap, and our measured approach to integration, to the launch of our own*

> *mobile ad exchange, MMX, we have been able to innovate and execute on behalf of our clients.* We are entering 2014 with a solid foundation to continue our growth in the coming months.

91.    In connection with the earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Barrett stated in part:

> We are at an important and unique time in the evolution of the mobile advertising industry, and the same goes for our company. *As the industry is in the state of evolution, transition and growth, so is Millennial.*
>
> * * *
>
> In Q4 we delivered some very strong results, but we also had some revenue generation during the quarter, which is not likely to repeat in Q 1. *I believe this is a business that should grow its topline at 20% or maybe a bit more, based on where the market is today,* with some quarters growing faster and some quarters growing slower.

92.    Later, as part of the question-and-answer session, CEO Barrett participated in the following exchange:

> [Analyst]: [J]umping in on the 20% general long-term revenue outlook. Most people probably think that the mobile industry is growing faster than that if you think about all of the different types of mobile ad product. *So does that imply that there are things happening out there that Millennial's not involved in and could Millennial [] get involved in those to potentially grow even faster than 20%?*
>
> CEO Barrett: As far as the annual guidance again, it is my choice as the new kid on the block that the direction we're going in this year is taking an overall look at both the market opportunities, with some of the capabilities we have, capabilities that we're building upon, and *we think that it's fair to say that this is a company we expect to have 20% growth this year.* I think that, that's all we can say about it at this juncture.

93.    On February 19, 2014, Millennial Media announced the appointment of Defendants Evans and Levinsohn to the Board.  The release by Millennial Media noted that

- 24 -

Defendant Barrett, who was hired as CEO less than one month before, had "known and worked with both Levinsohn and Evans over the past two decades."

94.     On March 3, 2014, after the markets closed, Millennial Media filed its Annual Report on Form 10-K with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND VIOLATED SECURITIES LAWS WHEN DISCUSSING MILLENNIAL MEDIA

95.     The statements referenced above failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     technological products and services crucial to the Company's business model were not fully functional, but, in fact, were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

(b)     the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media;

(c)     corporate acquisitions that Millennial Media undertook during the relevant period, including the acquisition of Jumptap, did not offer the business synergies claimed by the Company, but were rather undertaken to fill gaping holes in the Company's capabilities;

(d)     corporate acquisitions that Millennial Media undertook during the relevant period, including the acquisition of Jumptap, were misrepresented as progressing well through integration, when, in fact, the Company faced insurmountable integration challenges stemming from its own prior rushed and slipshod development; and

(e)     Defendants' statements regarding the outlook and prospects of the Company were materially false at all relevant times.

96.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began finally was revealed to the market on May 7, 2014.  After the markets had closed, the Company issued a press release announcing the results of its operations for the first quarter of 2014. The Company reported revenue of $72.6 million, which was below analyst expectations. Additionally, Millennial Media provided revenue guidance for the second quarter of 2014 of between $70 million and $75 million, **22 percent below** analysts' expectations of $96.4 million.

97.     Further, Millennial Media announced that CFO Avon would leave the Company "to pursue other career interests" at the end of the second quarter of 2014.

98.     In connection with this earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Barrett stated in part:

> Based on what I have seen to this point, I am enthusiastic ... [b]ut, I also realize that *we have some significant work to do.*
>
> * * *
>
> [O]ur performance business, especially the app download business, was ***down year-over-year and substantially from Q4, and these trends continue***.
>
> * * *
>
> In late 2013, the team recognized the need to shift much of the performance business to what are called programmatic platforms. Through acquisitions, internal development and a big partnership last year, Millennial built out its programmatic platform. But ***there is still work to be done to capture the benefits of the shift to programmatic.***
>
> * * *

By self-service interfaces and API's, performance advertisers can access Millennial's inventory, either directly or through a third-party DSP. For Millennial, this is a much more efficient way to serve small and midsize performance advertisers, which will help us build a performance business that is based on many singles and doubles each quarter instead of being reliant on the home runs. But **shifting from this home run business, relying on big hits, spending a lot of money, to a more healthy longer-term business based on singles and doubles, is a shift that will take some time to work through.**

99.     Later, as part of the question-and-answer session, CEO Barrett participated in the following exchange:

[Analyst]: I think last quarter you had talked about looking at kind of a 20 [percent] full-year growth rate. I guess, our assumption would be that that may change a little bit. And I apologize if I missed it, but I am just wondering if you are updating that view for the full year?

CEO Barrett: For the 20% outlook, I will address that right on. Because that was the guide-I said it, with the caveat that I was with the company for about 14 days. . . . **That guidance was loose.** It was kind of-we kind of expect it to grow in the 20% range. Brand was growing over 30%, and they expect it to grow so-at probably even at a faster rate in Q2. Performance is growing in the triple-digit area-I mean, I'm sorry platform is growing in the triple-digit area. **It is just that very difficult for me to sit here, and try to do the same loose guidance that I did in Q1.**

100.     On May 8, 2014, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

101.     In response to the disclosure of the extent to which Millennial Media's proprietary software and related technologies required additional investment and development to allow for revenue and earnings growth, and that the Company's corporate acquisitions had failed to fill the gaps in the Company's technology, Millennial Media's stock price stock price fell sharply,

declining $1.99 per share, or 37.20 percent, to close at $3.36 per share following the next trading session on May 8, 2014.

102.    Defendants' statements and omissions during the relevant period caused the Company's stock to trade at artificially inflated prices during the relevant period.

103.    As the truth relating to the Company's prior statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of Millennial Media's stock fell as the prior artificial inflation came out of its price.

### DAMAGES TO THE COMPANY

104.    As a result of the Individual Defendants' improprieties, Millennial Media disseminated improper, public statements concerning Millennial Media's technological capabilities, market position and financial condition.  These improper statements have devastated Millennial Media's credibility as reflected by the Company's loss of hundreds of millions of dollars in market capitalization loss from the relevant period high.

105.    Further, as a direct and proximate result of the Individual Defendants' actions, Millennial Media has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the securities class actions for violations of federal securities laws;

(b)    costs incurred from investigating the wrongdoing; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Millennial Media.

**Securities Class Action Now Pending Against Millennial media and a Majority of the Current Director Defendants**

106.    On September 30, 2014, the Public Employees' Retirement System of Mississippi (the "Mississippi Fund") filed a class action lawsuit in the United States District Court for the Southern District of New York (the "Securities Class Action") alleging that the Company and certain of its officers and directors violated the Exchange Act and the Securities Act of 1933 (the "Securities Act").[2]

107.    Specifically, the Mississippi Fund has alleged that Millennial Media, along with Defendants Palmieri (former CEO), Avon (former CFO) and Barrett (current CEO) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder between March 28, 2012 and May 7, 2014 by issuing false and misleading statements during that time.   The Mississippi Fund also alleges Defendants Palmieri, Avon and Barrett, as control persons of Millennial Media, violated Section 20(a) of the Exchange Act in connection with the alleged misstatements.

108.    The Mississippi Fund also has accused the Company, certain current and former Board members, three institutional shareholders and the Company's underwriters of violating Section 11 of the Securities Act for allegedly issuing misleading statements in connection with the Company's initial public offering.   Defendants Barrett, Goodman, Kerins, Millard and Tholen, each of whom currently serve on Millennial Media's current Board, are named as

---

[2]    *See Public Employees' Retirement System of Mississippi v. Millennial Media, Inc., et al.*, Civil Case No. 1:14-cv-07923-PAE (S.D.N.Y.).   A second lawsuit, alleging similar claims under the federal securities laws was filed on October 17, 2014: *Ostroviak v. Millennial Media, Inc., et al.*, Civil Case No. 1:14-cv-8330 (S.D.N.Y.)

defendants by the Mississippi Fund.  Defendants Palmieri, Avon, Goodman, Kerins, Millard and Tholen are also accused by the Mississippi Fund of violating Section 15 of the Securities Act.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively in the right and for the benefit of Millennial Media to redress injuries suffered, and to be suffered, by Millennial Media as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Millennial Media is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.    Plaintiff will adequately and fairly represent the interests of Millennial Media in enforcing and prosecuting its rights.

111.    Plaintiff was a shareholder of Millennial Media at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is current Millennial Media shareholders.

112.    The current Board of Millennial Media consists of the following seven individuals: Defendants Barrett, Goodman, Kerins, Millard, Tholen, Evans and Levinsohn. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**The Current Director Defendants Are Incapable of Investigating the Allegations In An Independent and Disinterested Manner As Each Faces a Substantial Likelihood of Personal Liability.**

113.    First, Defendant Barrett is not able to evaluate the derivative claims, let alone vigorously prosecuting them, as he is the Company's Chief Executive Officer and accused of being a primary participant in the wrongdoing that gave rise to the Securities Class Action.

114.    For much of the time since Millennial Media's IPO, Defendants Palmieri and Avon served as chief executive officer and chief financial officer, respectively. Defendants Palmieri and Avon are both individually named as defendants in the Securities Class Action, and each is accused of intentionally violating the federal securities laws as part of a "fraudulent scheme to artificially inflate the price of Millennial Media's stock during the Class Period." Defendant Palmieri resigned on January 25, 2014 and Defendant Avon resigned effective July 1, 2014.   Defendant Barrett became Millennial Media's CEO following Defendant Palmieri's resignation.  Defendant Barrett is accused of continuing the façade created by his predecessor in violation of Section 10(b) of the Exchange Act for alleged fraudulent conduct and faces personal liability in the Securities Class Action.   Defendant Barrett is thus unable to investigate the allegations against Millennial Media's current and former executives and Board members in a disinterested an independent manner rendering futile any demand upon him.

115.    Second, Defendants Goodman, Kerins, Millard and Tholen are also each named as defendants in the Securities Class Action for alleged violations of Section 11 for alleged wrongdoing in connection with the Company's IPO and Secondary Offering.   Defendants Goodman, Kerins, Millard and Tholen could not possibly investigate the alleged wrongdoings identified herein in a disinterested and independent manner because such an investigation would necessarily overlap with the alleged wrongdoing identified in the Securities Class Action, which could expose each to substantial personal liability.

116.    Third, Defendant Tholen is further incapable of assessing a demand to investigate the alleged wrongdoing due to his service on the Audit Committee during the period identified in the Securities Class Action.  As a member of the Audit Committee, Defendant Tholen reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter

provides that it is responsible for overseeing the accounting and financial reporting process of the Company and the audits of the financial statements of the Company.  Thus, Defendant Tholen was responsible for knowingly or recklessly allowing the improper statements issued by the Company.  Moreover, Defendant Tholen reviewed and approved the improper press releases made to the public.  Despite his knowledge, or with reckless disregard for the accuracy of the information, as a member of the Audit Committee Defendant Tholen caused these improper statements to be issued.  Accordingly, Defendant Tholen, along with the other Audit Committee Defendants, breached his fiduciary duty of loyalty and good faith by participating in the wrongdoing described herein.  Thus, Defendant Tholen faces a substantial likelihood of liability for his breach of fiduciary duties so any demand upon him is futile.

117.    Fourth, as members of Millennial Media's Board during the relevant period, Defendants Barrett, Goodman, Kerins, Millard, Tholen, Evans and Levinsohn failed to implement any internal controls to detect or prevent such violations, and failed to implement any system for monitoring compliance with reporting requirements.  Millennial Media's Board was responsible for ensuring that such internal controls were implemented and maintained.  Instead, as detailed herein, Defendants Barrett, Goodman, Kerins, Millard, Tholen, Evans and Levinsohn, took no action to ensure that the Company did not engage in the wrongdoing identified herein during the relevant period. The complete and utter failure of Defendants Barrett, Goodman, Kerins, Millard, Tholen, Evans and Levinsohn to establish a system of internal controls and compliance measures over many years is a breach of their duty of loyalty.

**Defendants Barrett and Levinsohn Maintain Roles With Millennial Media Which Render Each Incapable of Investigating the Board In An Independent And Disinterested Manner.**

118.    The principal professional occupation of Defendant Barrett is his employment with Millennial Media, pursuant to which he received and continues to receive substantial

monetary compensations and other benefits. Specifically, Defendant Barrett's initial employment agreement (as revealed in a Form 8-K filed with the SEC on January 30, 2014) provides for an annual salary of $500,000, which may increase at the Board's discretion. Barrett also received 1,500,000 stock options, which vest in 12 equal quarterly installments, and 500,000 restricted stock units which vest in four quarterly installments.  Barrett is also eligible to receive restricted stock unit awards of up to $2,000,000 annually upon reaching certain employment goals. For 2015, the annual restricted stock award will not be less than $1.5 million in value.

119.    Defendant Barrett is thus unable to investigate claims against Defendants Kerins and Goodman, who currently make up the Compensation Committee tasked with recommending executive compensation.  Nor is Defendant Barrett able to effectively investigate allegations of wrongdoing against other Board members as these Board members (particularly members of the Compensation Committee) are ultimately responsible for approving his compensation awards. This lack of independence renders Defendant Barrett incapable of impartially considering a demand to commence and vigorously prosecute any action against Defendants Kerins, Goodman, Millard or Tholen, who have been accused of wrongdoing both here and in the Securities Class Action.

120.    Defendant Levinsohn is recognized by the Company as an insider director and is thus not an independent member of the Board.

**The Current Director Defendants Have Failed to Act.**

121.    Millennial Media has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Director Defendants - who face personal liability for alleged misstatements issued by Millennial Media - have not filed any lawsuits against those who were responsible for the alleged wrongful conduct in an to attempt to

recover for Millennial Media any part of the damages Millennial Media suffered and will suffer thereby.

122.    Moreover, despite the Current Director Defendants having knowledge of the claims and causes of action asserted by the Mississippi Fund, the current Board has failed and refused to seek to recover for Millennial Media for any of the wrongdoing alleged by Plaintiff herein.

**FIRST CAUSE OF ACTION**
**Against the Officer Defendants and the Audit Committee Defendants for Breach of Fiduciary Duty**

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    The Officer Defendants (Palmieri, Avon and Barrett) each served as executive officers of Millennial Media during the relevant time, and as detailed above, each issued false and misleading statements to the public regarding Millennial Media's financial condition and operations.  As executives of the Company, Defendants Palmieri, Avon and Barrett owed and owe Millennial Media fiduciary obligations, including the highest obligation of good faith, fair dealing, loyalty, and due care.

125.    Defendants Palmieri, Avon and Barrett violated and breached their fiduciary duties of candor, good faith, and loyalty by causing, allowing and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

126.    The Audit Committee Defendants (Evans, Tholen, Levinsohn, MacIntosh and Markley) breached their fiduciary duty of loyalty by approving the statements described herein which were made during their respective tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit

Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

127.    As a direct and proximate result of the breaches of fiduciary obligations by the Officer Defendants and the Audit Committee Defendants, Millennial Media has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

128.    Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
**Against The Current Director Defendants and the Former Director Defendants for Breach of Fiduciary Duty for Failure to Maintain Internal Controls**

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The Current Director Defendants and the Former Director Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations.

131.    The Current Director Defendants and the Former Director Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.   Each of the Current Director Defendants and the Former Director Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.   The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

132.     The Current Director Defendants and the Former Director Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and disclosures of the Company.   The Current Director Defendants and the Former Director Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, the Current Director Defendants and the Former Director Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

133.     During the course of the discharge of their duties, the Current Director Defendants and the Former Director Defendants were aware of the unreasonable risks and losses associated with their misconduct.   Nevertheless, the Current Director Defendants and the Former Director Defendants caused Millennial Media to engage in the scheme described herein, and in the Securities Class Action, which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, the Current Director Defendants and the Former Director Defendants grossly mismanaged the Company, thereby causing damage to the Company.

134.     The conduct of the Current Director Defendants and the Former Director Defendants, as alleged herein, constituted an abuse of their control over the Company.

135.     As a result of these breaches, the Company's reputation in the business community and financial markets has been tarnished.

136.     Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Against The Individual Defendants for Waste of Corporate Assets**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    As a result of the Company's repeated false statements, the Individual Defendants have caused Millennial Media to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

139.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Against the Individual Defendants for Unjust Enrichment**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Millennial Media.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Millennial Media.

143.    Plaintiff, as a shareholder and representative of Millennial Media, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

144.    Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against the Officer Defendants and the Audit Committee Defendants for Violation of § 10(b) and Rule 10b-5 of the Exchange Act

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    During the Relevant Time, the Officer Defendants and Audit Committee Defendants disseminated or approved public statements that contained material misstatement and omissions regarding Millennial Media's financial condition and operations.   The Officer Defendants and Audit Committee Defendants knew that the Company's public statements concerning its financial condition and operations were misleading and intended to deceive, manipulate, and/or defraud in connection therewith.   Thus, the price of the Company's shares was artificially inflated due to the deception of the Officer Defendants and Audit Committee Defendants.

147.    As such, the Officer Defendants and Audit Committee Defendants caused the Company to violate §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud; and

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading.

148.    As a result of the Officer Defendants and Audit Committee Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of §10(b) of the Exchange Act and SEC Rule 10b-5.

149.    Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION
**Against the Officer Defendants and the Audit Committee Defendants for Violation of § 29(b) of the Exchange Act**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The Officer Defendants and Audit Committee Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §10(b) of the Exchange Act. The Officer Defendants and Audit Committee Defendants incentive compensation and fees should be rescinded under §29 of the Exchange Act because the Officer Defendants and Audit Committee Defendants violated §10(b) by making untrue statements of material facts or omitting material facts necessary in order to make the statements made, in light of the circumstances, not misleading as described in this complaint. All of the payments the Officer Defendants and Audit Committee Defendants received are therefore voidable by Millennial Media under §29(b) of the Exchange Act.

152.    Millennial Media is in privity with the Officer Defendants and Audit Committee Defendants with respect to the incentive compensation and fees provided by Millennial Media to the Officer Defendants and Audit Committee Defendants. The Officer Defendants and Audit Committee Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

153.    Millennial Media has been severely injured by the misconduct of the Officer Defendants and Audit Committee Defendants. Accordingly, Millennial Media is entitled to damages, *i.e.*, rescission of the incentives, compensation, and fees granted to the Officer Defendants and Audit Committee Defendants.

154.    Plaintiff, on behalf of Millennial Media, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Millennial Media, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment;

B.     Directing Millennial Media to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Millennial Media  and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(a)     creation of a Board-level committee charged with the oversight of the Company's testing of its products;

(b)     a proposal to strengthen the Company's controls over financial reporting;

(c)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(d)     a provision to permit the shareholders of Millennial Media to nominate at least three candidates for election to the Board; and

(e)     a proposal to strengthen Millennial Media's oversight of its disclosure procedures;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Millennial Media, has an effective remedy;

D.     Awarding to Millennial Media restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 15, 2015.

Respectfully submitted,

KAHN SWICK & FOTI, LLC

By: _____

Melinda A. Nicholson
melinda.nicholson@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana 70477
Telephone: (504) 455-1400
Fax: (504) 455-1498

Bruce M. Dona
bruce.dona@ksfcounsel.com
250 Park Avenue, Suite 2040
New York, New York 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

HOLZER & HOLZER, LLC
Corey D. Holzer, Esq.
Marshall P. Dees, Esq.
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Tel:  (770) 392-0090
Fax:  (770) 392-0029

VERIFICATION

I, Stephen Posko, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint For Breach Of Fiduciary Duty, Waste Of Corporate Assets, And Unjust Enrichment,, that I have reviewed the Verified Shareholder Derivative Complaint For Breach Of Fiduciary Duty, Waste Of Corporate Assets, And Unjust Enrichment, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: 1-14-15

Stephen Posko